# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 3, 2011

## WALTER ALAN MARTIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 04-05112      Carolyn Wade Blackett, Judge**

_____

**No. W2010-01609-CCA-R3-PC  - Filed August 9, 2011**

_____

The Petitioner, Walter Alan Martin, was convicted by a jury of rape and was, thereafter, sentenced to ten years in prison at 100%. This Court affirmed the Petitioner's conviction and sentence on direct appeal. The Petitioner filed a timely petition for post-conviction relief and, following an evidentiary hearing, the post-conviction court denied relief. On appeal, the Petitioner argues that he received the ineffective assistance of counsel due to trial counsel's failure (1) to adequately address the timeframe surrounding the events and (2) to fully investigate the case by inspecting the cab of the truck where the incident occurred. Following our review of the record and the parties' briefs, we conclude that the Petitioner has not shown that he is entitled to relief. The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, SP.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ, joined.

Joseph Ozment, for the appellant, Walter Alan Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and Brooks Yelverton, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

Following a jury trial in February 2006, the Petitioner was convicted of rape. See Tenn. Code Ann. § 39-13-503. Thereafter, the trial court imposed a sentence of ten years at 100% in the Department of Correction. See State v. Walter Martin, No. W2006-01148-CCA-R3-CD, 2007 WL 3005356, at *1 (Tenn. Crim. App., Jackson, Oct. 16, 2007), perm. to appeal denied, (Tenn. Apr. 7, 2008). On direct appeal, this Court summarized the facts established at trial as follows:

> The victim, Riitta-Maija Lehtinen, a United States citizen originally from Finland, testified that on June 14, 2004, she was in Lexington, Kentucky working as an airplane pilot for Shuttle America, which flies passenger aircraft for U.S. Airways Express. As she prepared to pilot a flight from Lexington to Pittsburgh, she received a telephone call at approximately 7:30 p.m. from a "state trooper in Kodiak, Alaska" who informed her that her boyfriend of seven years, also a pilot, had died in an airplane crash. After consulting her supervisor, she was released from her duties and allowed to leave.

> Ms. Lehtinen wanted to go to her home in Memphis immediately, so she could then travel to Alaska where her boyfriend had died. Initially, she tried to find a flight, but none would get her home that night. Then, she tried to rent a car, but no car was available. She also decided against taking a bus because it would have been too slow. At that point, she decided to hitchhike to Memphis. She explained that she had hitchhiked once before in Finland but had not ever hitchhiked in the United States.

> First, she briefly "caught [a] ride" with someone in a car who took her to the "Kentucky Parkway." Then, she was picked up by a truck driver who introduced himself as "Rattlesnake." Rattlesnake drove her to Union City, Tennessee. Before he dropped her off, Rattlesnake inquired over his commercial band radio whether another truck driver was going toward Memphis, and a truck driver who called himself "Indy" responded affirmatively. Ms. Lehtinen testified that this man, who was the [Petitioner], then picked her up and drove her from Union City to Memphis.

> She said that after approximately two and a half or three hours, they had arrived in Memphis and were driving "down on Highway 51," when the [Petitioner] said he needed to use the bathroom and pulled the

-2-

eighteen-wheeler truck into a shopping center. Ms. Lehtinen expected him to get out of the truck and relieve himself, but he did not. Rather, according to Ms. Lehtinen, he put a knife to her throat and told her he wanted to have sex with her. She did not see the knife but felt it against her throat. She began to cry and asked him repeatedly "how he could do this to her" because he knew someone very dear to her had died.

Ms. Lehtinen testified that the [Petitioner] physically lifted her into a bed in the back of the cab of the truck and again insisted that he wanted to have sex with her. She pleaded with him; he said he was going to hurt her; and he did "hurt [her] face." She was scared and "[f]elt really bad" and confused about what was happening. He lifted up her T-shirt and her bra and "started to suck and lick [her] breast." Then, he pulled down her pants and underwear and "started to lick [her] vagina."

Ms. Lehtinen stated that she did not attempt to fight. She "didn't see any point in fighting" because "he's a man. He-has more strength than I do and if I would start to fight maybe for sure he's going to kill me or I mean, I didn't see any point to it." She did not scream because she did not see anyone at the shopping center and did not "see any point in that either." Ms. Lehtinen testified that it was "around" 3:00 a.m. when these events were taking place and that they were in a shopping center near Highway 51 in Shelby County.

She testified that the [Petitioner] "put his fingers into [her] vagina," and then he "penetrated with his penis." She stated that his penis was inside her vagina for "about three minutes" and that he ejaculated while his penis was inside her.

Afterward, the [Petitioner] got back into the driver's seat and drove her to a place near the Memphis airport. Ms. Lehtinen testified that it took "probably 10, 15 minutes" to drive from the shopping center where the incident occurred to this location near the airport. She got out of the truck, and he "said he was sorry" and left. Ms. Lehtinen then called 9-1-1. Twenty minutes later, a police officer picked her up near the intersection of I-240 and Airways Boulevard.

The policeman drove her to the "Rape Crisis Center" in Memphis where she told a nurse what had happened to her. The nurse had her take off her clothes and conducted a thorough examination. The examination took about

twenty minutes. Then, she was driven to her car, which was parked in the employee parking lot at the airport, and she went home.

Officer Thomas E. Woods of the Memphis Police Department testified that, after being dispatched at approximately 3:45 a.m., he retrieved Ms. Lehtinen from the shoulder of I-240 near Airways Boulevard. According to Officer Woods, she was "distressed" and told him that she had been hitchhiking and was raped by a truck driver in a shopping center off Highway 51 in Memphis. After consulting with his Lieutenant, Officer Woods took Ms. Lehtinen to the Memphis Rape Crisis Center.

Julie Atkeison, a nurse from the Memphis Sexual Assault Resource Center, testified that she conducted "a full physical exam" of Ms. Lehtinen the morning after the incident. Atkeison stated that Ms. Lehtinen "was very upset" and that she "was just crying during the whole time that we were talking." Atkeison did not observe any bruising or any other injury after conducting a speculum exam. Asked whether the absence of injury was medically significant in a rape case, Atkeison explained that "[i]t can be. She is a . . . mature female. She can have babies. So her hymen stretches to allow passage of a baby. So not finding an injury is not significant in someone who is in the age range of 16 to 45 in those child bearing years." Atkeison also testified that it is "very common not to find injuries" in rape victims.

Atkeison swabbed her breasts and vaginal area for evidence and sent the swabs to the Tennessee Bureau of Investigation. The [Petitioner] stipulated at trial that the bureau's DNA analysis revealed that his saliva was present on both her breasts and that his spermatozoa and saliva were present inside her vagina.

Ms. Lehtinen also testified that "[a] few days" after the medical examination, she described the man who raped her, as well as the numbers and markings on his truck, to Sergeant Daniel Parris of the Memphis Police Department. Subsequently, she viewed a "photo spread" and positively identified the [Petitioner] as her rapist. Ms. Lehtinen again identified him in the courtroom.

Ms. Lehtinen further testified that she had bruising on her arm that was sustained when the [Petitioner] lifted her from the front seat into the bed inside the cab of the truck and that she did not want to have sex with the [Petitioner].

-4-

On cross-examination, Ms. Lehtinen testified that she was in the truck with the [Petitioner] for "about two and a half, three hours" from the time he picked her up in Union City until he pulled into the shopping center. She later returned to the shopping center with Sergeant Parris. She remembered green lights in the shopping center, but when she returned there, she identified the place because it had green paint. She did not know where the county line was on Highway 51. Ms. Lehtinen explained how she recognized the location of the incident when she returned there with Sergeant Parris, saying that "[i]t looked exactly the same, the buildings, the setup, everything." She confirmed that she was "sure" of the location.

Sergeant Daniel Parris, of the Memphis Police Department's Sex Crime Unit, testified that he was the officer in charge of Ms. Lehtinen's case. Sergeant Parris stated that he met with Ms. Lehtinen "a day or so" after the incident and that she described "some landmarks of where she thought [the rape] had happened." After she gave a statement, Ms. Lehtinen led Sergeant Parris to the location where she was raped. He testified that it was in the parking lot of a Kroger grocery store near the intersection of "Thomas and Whitney," and he confirmed that this shopping center was in Shelby County. He also stated that a Mapco Express gas station in the parking lot had green lights.

The [Petitioner] testified that at the time of the incident he lived in Elgin, Oklahoma and was working as a truck driver for Ryan's Trucking. On the day in question, he was on his way from Union City, Tennessee to Houston, Texas when he met Ms. Lehtinen. After a call came out over his "CB radio" asking whether "somebody was heading towards Memphis that could give somebody a ride," he answered saying that he "had no problem giving them a ride." At that time, he was introduced to Ms. Lehtinen and told that she needed to get to Memphis so that she could then go to Alaska where "a friend had an accident." The [Petitioner] testified that once they began driving toward Memphis, they discussed their lives with each other and conversed about how their jobs were similar.

According to the [Petitioner], approximately one hour after they set out from Union City, they stopped just south of Dyersburg when Ms. Lehtinen "abruptly asked if [he] wanted oral sex," and he said, "okay." She reached over and started "undoing" his pants and then performed oral sex on him as he drove. The [Petitioner] described the ensuing events as follows:

-5-

> A few minutes later I come [sic] to a stop light and she looks up and tells me she wants to have intercourse. So I'm like trying to figure out-I'm looking around trying to figure out a place so I can pull over to stop so I can oblige her.
>
> I see a place across the street right in front of a McDonald's. So I'm waiting on the light to change so I start shifting gears, but in the meantime, once I see a place to park I tell her to get in the back and get ready and she does.

He said that while she undressed herself, he parked on the shoulder of the road in front of the McDonald's restaurant, and then he undressed and had sex with her in the "sleeper" portion of the cab of the truck. The "incident" took "anywhere from 20 to 35 minutes," and then he realized that he "was falling a little bit behind schedule," so he got dressed and started driving again. He stated that Ms. Lehtinen stayed in bed and that they did not speak again until they arrived at the Memphis city limits about an hour and a half later.

He testified that he did not have a knife in the cab of his truck and that he did not threaten to harm her or strike her. He did not find out there was "a problem" until July 24 or 25 when Sergeant Parris contacted the owner of Ryan's Trucking. He then "went on the internet" and discovered that there was a warrant out for his arrest and later turned himself in to local authorities.

On cross-examination, he denied ever performing oral sex on Ms. Lehtinen despite the fact that the laboratory report from the Tennessee Bureau of Investigation stated that his saliva was recovered from her vagina. He confirmed that he frequently had chance sexual encounters like the one he described and maintained that the sex with Ms. Lehtinen was consensual.

Id. at *1-4 (footnote omitted). Our supreme court denied the Petitioner's application for permission to appeal on April 7, 2008.

The Petitioner then filed a pro se petition for post-conviction relief on February 3, 2009. Counsel was appointed to represent the Petitioner, and an amended petition was filed thereafter. The Petitioner argued that he was denied the effective assistance of counsel at trial. Specifically, he claimed that trial counsel (1) failed to meet with him enough to prepare a defense; (2) failed to present pertinent evidence; (3) failed to properly prepare for trial; (4) failed to request a change in venue; (4) failed to fully investigate the case; and (5) failed to adequately explain the sentence the Petitioner was facing if convicted.

-6-

A hearing was held in the post-conviction court, at which only trial counsel and the Petitioner testified. Trial counsel, who had primarily practiced criminal law for over forty years, testified that his office began representing the Petitioner following his indictment in 2004. Counsel acknowledged that Gary Bartlett signed the "court jacket" in August 2004 and that there may have been some initial confusion about which attorney in his firm was going to handle the case. After discussing the case with the other lawyers in his firm, trial counsel took over representing the Petitioner. The Petitioner's trial took place in February 2006, and trial counsel appealed the Petitioner's conviction and sentence for no extra charge. Trial counsel believed he was fully prepared for the Petitioner's trial and allowed the Petitioner to be involved in his defense.

When asked how many times he met with the Petitioner, trial counsel estimated at least five or six times before trial and, as it got closer to trial, he spent "a large amount of time in the jail going over [the Petitioner's] testimony and reviewing where this was alleged to have happened, how it happened, whatever." Trial counsel also stated that he spent a lot of time talking with the Petitioner's mother. According to trial counsel, the Petitioner insisted that he never threatened the victim or cut her with a knife and that the sex was consensual. Trial counsel stated that he did not hire an investigator to assist with the Petitioner's case as he saw no need for one.

Because the defense was consent, the only two people who could testify about the issue directly were the Petitioner and the victim. Moreover, impeachment of the victim's testimony was critical to the Petitioner's defense. Trial counsel tried to reach the victim before trial but was unsuccessful. Trial counsel stated that his strategy "was to make this lady look somewhat like a lady of the evening, hopping rides and whatever, just going from one location to another." He stated, "It certainly looked and sounded suspicious that here is this lady that is supposedly a pilot, or whatever and gets in a truck to get to Memphis." Trial counsel opined that his strategy was somewhat successful, as the jury did not find the Petitioner guilty of aggravated rape, only rape, indicating that they did not believe the victim's testimony that a knife was involved.

Trial counsel confirmed that he raised the issue of venue in the trial court, trying to show that the incident did not occur where the victim said it did, a gas station in Frayser. Trial counsel believed that it was only about 80 miles from Union City to Memphis traveling on Highway 51; however, the victim stated that it took well over two hours before they arrived in Memphis. He brought this discrepancy to the court's attention in his venue argument. However, the trial court, and this Court on appeal, found that venue was established by a preponderance of the evidence.

Trial counsel stated that he was aware that truckers kept "log books"; however, he did not see how it would have helped the Petitioner's defense as they did not dispute that he picked her up in Union City. He also did not see how the credit card receipt from the Union City gas station would have been helpful to the Petitioner's case. Trial counsel stated that the Petitioner never gave him any information concerning "Rattlesnake's" identity or how he could get in touch with him.

Trial counsel testified that he told the Petitioner not to talk about the victim's gratuitous act of oral sex during his testimony unless he was asked about it by the prosecution. Trial counsel opined that the story was "a little far-fetched[,]" and he did not think it would have helped the Petitioner's defense as it did not have any bearing on whether the sex was consensual. Despite trial counsel's advice, it took the Petitioner roughly three minutes before he brought it up in front of the jury.

Regarding the Petitioner's sentencing exposure, trial counsel informed the Petitioner of the sentence he faced if convicted as charged. According to trial counsel, the Petitioner was not interested in accepting any plea deal because he maintained that the encounter was consensual.

The Petitioner then testified that, prior to his first court appearance, his family hired trial counsel's firm to represent him. According to the Petitioner, no one showed up at his initial court date in August 2004, and the case was put off for two more weeks. According to the Petitioner, Gary Bartlett did not appear in court until his second court appearance and, thereafter, the Petitioner dealt with another attorney from the firm. The Petitioner testified that he did not see trial counsel until the end of 2005. The Petitioner later acknowledged that Gary Bartlett signed the "court jacket" on August 30, 2004.

The Petitioner alleged that the truck "log books" and the Union City credit card receipt were important to establish the timeframe for these events and were relevant to venue and other issues. He claimed that he told someone with trial counsel's firm of the "log books" and the name of the company where the other truck driver worked. Furthermore, he believed these items of evidence would have been helpful in impeaching the victim's credibility about the time and location of their initial meeting and in locating the other truck driver. The Petitioner testified that it took between "two and a quarter hours, to two and a half" to drive from Union City to Memphis, which he admitted was consistent with the victim's testimony. His dispute was with the initial time he picked the victim up at the gas station in Union City: "when I picked her up was an hour difference than what she stated in the report." The Petitioner also wanted trial counsel to find the other driver to see if they also had sex.

The Petitioner testified that his truck, where the incident occurred, was available for inspection in Oklahoma, but that no one from trial counsel's firm ever went to see the truck. He believed that, if they had looked at the truck, then they would have seen that it was impossible to physically lift someone into the bed of the truck cab.

According to the Petitioner, "Hawk-eye investigation" was hired to investigate his case. He believed the investigator tried to talk with the victim at some location in Cordova. The Petitioner also testified that trial counsel failed to hire an expert to challenge the DNA evidence; he then conceded that there was no real argument that the DNA was not his.

When asked about his meetings with trial counsel, the Petitioner stated that trial counsel came to visit him between two and five times, "but he only asked, exactly, do you know what you're going to say." Trial counsel then went to talk with other clients in the jail. According to the Petitioner, he never discussed his "full testimony" with trial counsel or whether or not he would even take the stand to testify. However, trial counsel was informed that the act was consensual, and the Petitioner acknowledged that trial counsel pursued this defense at trial. The Petitioner testified that trial counsel never told him not to discuss the oral sex act in front of the jury. The Petitioner stated that he had tried to fire the previous lawyer from trial counsel's firm, but that trial counsel came to him and stated, "I'll represent you better."

The Petitioner confirmed that he declined the plea offer made before trial because he did not commit the offense. According to the Petitioner, at one point, there was an offer for "time served[.]"

After hearing the evidence presented, the post-conviction court denied relief by written order dated June 28, 2010. This timely appeal followed.

**Analysis**

On appeal, the Petitioner contends that trial counsel failed to provide the effective assistance of counsel guaranteed him by the United States and Tennessee constitutions at trial. Specifically, he argues that he received the ineffective assistance of counsel due to trial counsel's failure (1) to adequately address the timeframe surrounding the events and (2) to fully investigate the case by inspecting the cab of the truck where the incident occurred.[1]

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right.

---

[1] He has abandoned his other claims for relief on appeal.

Tenn. Code Ann. § 40-30-103. To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics,

see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

First, the Petitioner challenges trial counsel's effectiveness about addressing the timeframe surrounding the events:

> [The Petitioner] testified at his post-conviction hearing that trial counsel . . ., never challenged the time frame of how long it takes to drive from Union City to Memphis and that essentially if trial counsel had done so it would have been clear that venue was improper in Shelby County. . . . Clearly the [P]etitioner was prejudiced by counsel's failure to properly challenge venue.

Trial counsel testified that he raised the issue of venue in the trial court. Trial counsel was aware that it was around 80 miles from Union City to Memphis traveling on Highway 51 and that the victim stated it took well over two hours before they arrived in Memphis. According to trial counsel, he brought this discrepancy to the attention of the trial court, and he was almost successful with his venue argument. However, the trial court ultimately determined that the State had established venue by a preponderance of the evidence.

In conjunction with this argument, the Petitioner testified that trial counsel should have reviewed his truck "log books," which would have supported his timeframe of the events, further impeaching the victim's testimony, and leading trial counsel to find "Rattlesnake," the other truck driver. However, the Petitioner failed to introduce these books or present "Rattlesnake" at the post-conviction hearing. We can not speculate on how this evidence might have affected the outcome of the Petitioner's trial. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Moreover, trial counsel testified that he believed he was prepared for trial and that he did not see how the "log books" would have been helpful to the Petitioner because he did not dispute picking the victim up in Union City. Also, according to trial counsel, the Petitioner

failed to provide him with any information concerning "Rattlesnake's" identity or how he could get in touch with him. Finally, trial counsel pursed the venue issue on appeal, and this Court determined that the evidence was sufficient to establish venue:

> The victim testified that the rape occurred in a shopping center beside Highway 51 after she and the [Petitioner] had driven for over two and a half hours from Union City and arrived in Memphis. Officer Woods testified that, on the morning of the incident, Ms. Lehtinen informed him that the rape occurred in Memphis. Sergeant Parris testified that he accompanied Ms. Lehtinen to the location of the offense and confirmed that it was in Shelby County. Notwithstanding the [Petitioner's] testimony to the contrary—which the jury did not accredit—we conclude that the cumulative testimony of Ms. Lehtinen, Officer Woods, and Sergeant Parris established venue by a preponderance of the evidence.

Martin, 2007 WL 3005356, at *5 (footnote and citations omitted). We agree with the post-conviction court that the Petitioner has failed to show ineffective assistance of counsel in this regard.

As to his second ground of ineffectiveness, the Petitioner claims that trial counsel failed to conduct an adequate investigation into the facts of the case:

> The [Petitioner] also testified that it was relevant to his defense that the truck be examined to show that there was not enough room for him to lift the victim within the cab of the truck. . . . Had [trial counsel] investigated the size of the cab of the truck he could have further impeached the victim's testimony [,] which would have resulted in a complete acquittal of all charges. . . . As such, the [P]etitioner was clearly prejudiced by counsel's failure to visit or investigate the crime scene for the purpose of further impeaching the victim's tale of events.

Trial counsel testified that he tried to find the victim prior to trial in order to interview her but that he was unsuccessful. He did not dispute that he did not inspect the truck. At trial, the victim testified that the Petitioner "physically lifted her into a bed in the back of the cab of the truck" where he raped her, but the Petitioner claimed that the sex was consensual. Martin, 2007 WL 3005356, at *1-4. The Petitioner testified at the post-conviction hearing that, if trial counsel had inspected the truck, then he would have discovered that it was physically impossible to lift someone into the truck cab. However, the Petitioner did not present any evidence at the hearing about the dimensions of the truck or why it was physically impossible to lift someone inside the truck cab. Again, we will not guess as to

-12-

what evidence further investigation may have uncovered. <u>See</u> <u>Black</u>, 794 S.W.2d 752. Moreover, the jury obviously accredited the testimony of the victim over that of the Petitioner at trial. The Petitioner has not shown deficiency or prejudice. Accordingly, the Petitioner has failed to demonstrate ineffective assistance as to this issue.

The record supports the finding of the post-conviction court that the Petitioner received the effective assistance of counsel at trial. We conclude that the Petitioner established neither deficient representation by counsel nor prejudice from the shortcomings that he alleged.

## Conclusion

The Petitioner has failed to show that did not receive the effective assistance of counsel at trial. The Shelby County Criminal Court's denial of post-conviction relief is affirmed.

_____
DAVID H. WELLES, SPECIAL JUDGE